# EXHIBIT "A"

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
TORRANCE MEMORIAL MEDICAL CENTER

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JANE DOE, individually and on behalf of others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

  You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

  There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

  *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

  *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of the State of California,<br><br>County of Los Angeles, 111 North Hill St., Los Angeles, CA 90012 | **CASE NUMBER:**<br>*(Número del Caso):*<br>23STCV00395 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael A. Caddell, Caddell & Chapman, P.O. Box 1311, Monterey, CA 93942  telephone: (713) 751-0400

| | | |
|---|---|---|
| DATE: 01/09/2023<br>*(Fecha)* | Clerk, by  David W. Slayton, Executive Officer/Clerk of Court<br>*(Secretario)*  G. Carini | Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario  Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* TORRANCE MEMORIAL MEDICAL CENTER

   under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100  [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |

Electronically FILED by Superior Court of California, County of Los Angeles on 01/09/2023 01:36 PM David W. Slayton, Executive Officer/Clerk of Court, by G. Carini,Deputy Clerk
Case 2:23-cv-01237-RGK-MAR   Document 1-1003F5led 02/17/23   Page 3 of 122   Page ID #:17
Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Lawrence Riff

1  Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
2  Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
3  Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
4  CADDELL & CHAPMAN
P.O. Box 1311
5  Monterey CA 93942
Tel.: (713) 751-0400
6  Fax: (713) 751-0906

7  Foster C. Johnson
fjohnson@azalaw.com (SBN 289055)
8  David Warden (*pro hac vice forthcoming*)
dwarden@azalaw.com
9  Joseph Ahmad (*pro hac vice forthcoming*)
jahmad@azalaw.com
10  Nathan Campbell (*pro hac vice forthcoming*)
ncampbell@azalaw.com
11  AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
12  Houston TX 77010
Tel: (713) 655-1101
13  Fax: (713) 655-0062

14  *Attorneys for Plaintiff*

15

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

16

## COUNTY OF LOS ANGELES

| | |
|---|---|
| 17   JANE DOE, individually and on behalf of others similarly situated, | |
| 18         *Plaintiff,* | CASE NO. 23STCV00395 |
| 19 | |
| 20        *v.* | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| 21   TORRANCE MEMORIAL MEDICAL CENTER, | |
| 22         *Defendant.* | |

23

24

25

26

27

28

CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jane Doe, individually and on behalf of all other California citizens similarly situated, brings suit against Defendant Torrance Memorial Medical Center ("Defendant" or "Torrance Memorial"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## I. SUMMARY OF ALLEGATIONS

1.      This case arises from Defendant's systematic violation of the medical privacy rights of patients and users of Defendant's services, resulting in the disclosure of highly sensitive personal information to Facebook without those patients' or users' knowledge or consent.

2.      Defendant's "Website Privacy Policy" tells patients and prospective patients that "Your privacy is very important to us."[1] Indeed, Defendant promises patients and prospective patients that "[w]e will not use or disclose your Health Information for marketing purposes without your written authorization."[2] Contrary to these assurances, Defendant does not follow these policies, nor does it follow the law prohibiting such disclosures.

3.      Since at least 2017, Defendant has disclosed information about prospective and actual patients—including their status as actual or potential patients, their actual or potential physicians, their actual or potential medical treatments, the hospitals they visited or may visit, and their personal identities—to Facebook and other third parties without their knowledge, authorization, or consent.

4.      Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect personal health information to Facebook, who exploits that information for advertising purposes. Defendant's use of these rerouting tools causes personally

---

[1] https://www.torrancememorial.org/website-privacy-notice/

[2] https://www.tmphysiciannetwork.org/app/files/public/8fa720fb-71e9-47b9-aa4a-68bc32931845/Torrance%20Memorial%20Physician%20Network/Pt%20Privacy/Notice-of-Privacy-Practices-TMPN.pdf

CASE NO.                                        – 1 –

identifiable information and the contents of communications exchanged between actual and prospective patients with Defendant to be automatically redirected to Facebook in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of California, and both the express and implied promises of Defendant.

5.      Defendant's conduct in disclosing such protected health information to Facebook violates California law, including the California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 630, et seq.; the California Confidentiality of Medical Information Act ("CMIA"), CAL. CIVIL CODE §§ 56.06, 56.10, 56.101; the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502; and Invasion of Privacy and Violation of the California Constitution, ART. 1, § 1.

6.      Plaintiff continues to desire to search for health information on Torrance Memorial's website. Plaintiff will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use the Torrance Memorial website to search for health information in the future.

7.      On behalf of herself and all similarly situated persons, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of personal information; awarding statutory damages in the amount of at least $5,000 per violation, attorneys' fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## II. PARTIES

A. Plaintiff

8.      Plaintiff Jane Doe is a resident of Los Angeles County, California.

9.      Plaintiff Jane Does has used the Torrance Memorial website to search for Torrance Memorial doctors and medical treatment.

10.      Plaintiff Jane Doe's use of the Torrance Memorial website entailed providing Jane Doe's sensitive medical information, such as conditions for which she was seeking treatment.

11.     Plaintiff Jane Doe has been a patient at Defendant Torrance Memorial Medical Center.[3]

**B. Defendant**

12.     Defendant Torrance Memorial Medical Center is a California corporation with its principal place of business located at 3300 Lomita Blvd, Torrance, California 90505.

### III. JURISDICTION AND VENUE

13.     This Court has jurisdiction over Defendant because it regularly conducts business in California, including in Los Angeles County, and has its principal place of business in California.

14.     Venue is appropriate in this Court because the injuries giving rise to the alleged causes of action occurred in Los Angeles County and because Plaintiff Jane Doe resided in Los Angeles County at the time the offer of services for personal use was made by Defendant. *See* CAL. C.C.P. §§ 395(a) & 395(b). Venue is also appropriate in this Court because Los Angeles County is the county in which the cause, or some part of the cause, arose for the recovery of a penalty imposed by statute. *See* CAL. C.C.P. § 393(a).

### IV. FACTUAL BACKGROUND

15.     Plaintiff Jane Doe visited Defendant's website to look for doctors, research treatments, and investigate her insurance options at https://www.torrancememorial.org/. Plaintiff had concerns about a concussion she had suffered and about receiving healthcare to help with her recovery. Plaintiff entered data on Torrance Memorial's website, including sensitive medical information and details about her medical condition. She also searched for a doctor on Torrance Memorial's website to help her with treatment.

16.     Unbeknownst to Plaintiff Jane Doe, Torrance Memorial had embedded computer code on its website that took every search term she entered and every page of the site she visited and sent that information directly to Facebook, the largest and most profitable social media

---

[3] https://www.torrancememorial.org/

company on the planet. Torrance Memorial accomplished this by installing Facebook's "Meta Pixel" tool on almost every page of Torrance Memorial's website. The Meta Pixel worked like a listening device. Each time Plaintiff Jane Doe typed a search term, the Meta Pixel recorded the information she entered and transmitted it to Facebook, along with identifying information that let Facebook know exactly who Jane Doe was. Instantaneously, Facebook knew that Jane Doe was interested in medical treatment for her concussion. Facebook then took this information and added it to all of the other information it keeps about consumers, matching Jane Doe's interest in medical treatment with her Facebook profile, name, address, interests, and other websites she had visited. This information then became available for Facebook's advertisers to use when Facebook sold them targeted advertising services.

17.     Plaintiff was surprised and troubled that information she believed was being communicated only to Torrance Memorial for the purpose of obtaining medical treatment had been sent to Facebook and used to target advertisements to her. Plaintiff subsequently learned that thousands of Torrance Memorial patients like her had similarly had their privacy rights violated. Most of these consumers were likely not even aware of this privacy violation, much less able to hire counsel to stop the illegal conduct. Plaintiff therefore now brings these claims to correct Torrance Memorial's privacy violations and obtain relief for herself and thousands of similarly situated consumers.

## V. CLASS ACTION ALLEGATIONS

**A. Defendant routinely discloses the protected health information of patients and users of its services to Facebook.**

18.     Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

19.     Medical patients and those seeking medical treatment in California such as Jane Doe have a legal interest in preserving the confidentiality of their communications with health

care providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

20.     As a health care provider, Defendant has common law and statutory duties to protect the confidentiality of patient information and communications.

21.     Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

22.     Defendant operates websites for current and prospective patients, including https://www.torrancememorial.org/.

23.     Defendant's websites are designed for interactive communication with patients and users, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issue treatment options, and joining support groups.

24.     Notwithstanding prospective and current patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of prospective and current patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B.  The Nature of Defendant's Unauthorized Disclosure of Patients' Health Care Information**

25.     Defendant's disclosure of current and prospective patients' personal healthcare information occurs because Defendant intentionally deploys source code on the websites it operates, including https://www.torrancememorial.org, that causes current and prospective patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

26.     By design, third parties receive and record the exact contents of these communications before the full response from Defendant has been rendered on the screen of the

patient's or user's computer device and while the communication with Defendant remains ongoing.

27.     Websites like those maintained by Defendant are hosted by a computer server through which the businesses in charge of the website exchange and communicate with internet users via their web browsers.

28.     The basic command that web browsers use to exchange data and user communications is called a GET request.[4] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

29.     When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

30.     The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

31.     In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

---

[4] https://www.w3schools.com/tags/ref_httpmethods.asp

32.     Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are given no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

33.     In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

34.     Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

35.     These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

36.     A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C.  Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

37.     Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

38.     For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[5]

39.     Because of their uniquely identifying character, IP addresses are considered protected personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

40.     Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

41.     Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

42.     Cookies are considered personal identifiers, and tracking pixels can collect cookies from website visitors.

---

[5] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

43.     A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

44.     These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[6] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[7] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[8]

45.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[9]

46.     Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

47.     A fourth kind of personally identifying information is the unique user identifier (such as Facebook's "Facebook ID") that permits companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is a number string that is connected to a user's Facebook profile.[10] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[11]

---

[6] https://www.blog.google/products/chrome/building-a-more-private-web/

[7] https://pixelprivacy.com/resources/browser-fingerprinting/

[8] https://www.blog.google/products/chrome/building-a-more-private-web/

[9] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

[10] https://www.facebook.com/help/211813265517027

[11] https://smallseotools.com/find-facebook-id/

CASE NO.                                                    – 9 –

48.     Unique personal identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

**D. Facebook's Business Model: Exploiting User Data to Sell Advertising**

49.     Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

50.     Facebook describes itself as a "real identity" platform.[12] This means that users are permitted only one account and must share "the name they go by in everyday life."[13] To that end, Facebook requires users to provide their first and last names, along with their birthday, telephone number and/or email address, and gender, when creating an account.[14]

51.     In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[15] Facebook has since evolved into one of the largest advertising companies in the world.[16] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[17] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[18]

52.     Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[19]

---

[12] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[13] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[14] https://www.facebook.com/help/406644739431633

[15] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[16] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[17] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[18] https://www.facebook.com/business/ads/ad-targeting

[19] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

53.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

54.     Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers.

55.     Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allows an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

56.     Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[20] Aided by highly granular data used to target specific

---

[20] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

57.     To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

58.     One of Facebook's most powerful tools is called the "Meta Pixel." Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[21]

59.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[22] Once activated, the Meta Pixel "tracks the people and type of actions they take."[23] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[24] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[25]

60.     When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but

---

[21] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[22] https://developers.facebook.com/docs/meta-pixel/

[23] https://www.facebook.com/business/goals/retargeting

[24] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[25] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

simultaneous) channel in a manner that is undetectable by the user.[26] The information sent to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[27] These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users' browsing histories on third-party websites and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[28]

61.     For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. All this personally identifying data is included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

62.     These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta Pixel allows third-party websites to send users' personal information to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[29]

---

[26] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

[27] *In re Facebook,* 956 F.3d at 596.

[28] *In re Facebook,* 956 F.3d at 596.

[29] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

63.     In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[30]

64.     Facebook shares analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

65.     Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[31] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[32]

66.     Facebook warns web developers that its Pixel is a personal identifier because it enables Facebook "to match your website visitors to their respective Facebook User accounts."[33]

67.     Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[34]

68.     Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[35] Meta Pixel tracks this data regardless of whether a user is

---

[30] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[31] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

[32] https://www.oviond.com/understanding-the-facebook-pixel

[33] https://developers.facebook.com/docs/meta-pixel/get-started

[34] https://developers.facebook.com/docs/meta-pixel/get-started

[35] https://developers.facebook.com/docs/meta-pixel/

logged into Facebook.[36] It is unclear how Facebook exploits the data collected from nonusers, but when asked by Congress about Facebook's business practices, Mark Zuckerberg conceded that company maintains "shadow profiles" on nonusers of Facebook.[37]

69.     For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

70.     For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[38] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[39] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[40]

71.     Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[41]

72.     Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

---

[36] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients

[37] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

[38] https://developers.facebook.com/docs/meta-pixel/

[39] https://developers.facebook.com/docs/meta-pixel/

[40] https://developers.facebook.com/docs/meta-pixel/

[41] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

73.     If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

74.     Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[42] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[43]

75.     Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." These are two forms of Advanced Matching: manual matching and automatic matching.[44] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

76.     While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[45] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[46]

77.     Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to

---

[42] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/

[43] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

[44] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[45] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[46] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

CASE NO.                                    – 16 –

Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

78.     Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

79.     The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

80.     Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[47] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, as well as such highly sensitive data as medical information, religion, and political preferences.[48]

81.     Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The

---

[47] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[48] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

CASE NO.                              − 17 −

likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.adventisthealth.org/, and target users with advertising based on their web activity.

**F. Defendant has discreetly embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' and users' protected health information to Facebook.**

82.     A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

83.     Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[49] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

84.     Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[50] For example, websites can use this data to create "custom audiences" to

---

[49] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[50] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[51] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

85.    Meta Pixel is wildly popular with businesses and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, which by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States.[52] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

86.    Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

87.    Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a prospective or actual patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is immediately and

---

[51] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[52] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

1   instantaneously transmitted to Facebook via the Meta Pixel. The acquisition and disclosure of these

2   communications occurs contemporaneously with the transmission of these communications by

3   patients.

4       88.     This data, which can include health conditions (e.g., addiction, heart disease,

5   cancer), diagnoses, procedures, test results, the treating physician, medications, and other

6   personally identifying information ("Personal Health Information"), is obtained and used by

7   Facebook, as well as other parties, for the purpose of targeted advertising.

8       89.     For example, a visitor searching for a doctor on Defendant's website is asked to

9   provide a variety of information to filter the various physicians available to treat various medical

10  conditions, including the doctor's specialty and the prospective or actual patient's location:

11



24

25      90.     When a patient clicks on the "search" button, Defendant's website generates a list

26  of providers that a patient can review and choose from:

27

28



91.     All the data about patients' interactions with Defendant's website is disclosed to Facebook simultaneously in real time as visitors transmit their information, such as the doctor they choose for treatment, the doctor's specialty, the patient's location, and the patient's language and gender preferences. Along with other data, Defendant also discloses patients' unique Facebook IDs, which are captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

92.     Likewise, Defendant allows patients to search for information about "Medical Care" organized by specialty, such as "Cancer," "Heart Health," "Orthopedics, and "Maternal and Child." A patient searching for information about cancer treatment or pregnancy, however, not only shares their personal data with Defendant but also unknowingly shares their personal data with Facebook.

93.     Defendant discloses such personally identifying information and sensitive medical information even when patients or users are searching for doctors to assist them with conditions such as substance abuse and addiction:

## Search Torrance Memorial

| substance abuse | Search |

### Related Pages

Found 34 pages matching the search term **substance abuse**.

 **What Every Parent Needs to Know**
Substance use and abuse during adolescence can have permanent consequences.
2/27/2018

 **Medication Assisted Treatment**
Medication assisted treatment (MAT) for substance use disorders at the Thelma McMillen Center for Alcohol and Drug Treatment.
2/27/2018

 **Returning to School in 2021: A Parent's Survival Guide**
9/23/2021

 **Mental Health Corner**
Our feelings and thoughts are connected. Our feelings are always correct and result from our thinking. Our thinking can be inaccurate, distorted or based on old information.
8/28/2022

94.     As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. A simple search for "pregnancy" on Defendant's website tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. Likewise, most patients would not want it made public that they were seeking treatment for substance abuse. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically transmitted

to Facebook for advertising purposes—even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

95.     Defendant also discloses prospective and actual patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for classes and services offered by Defendant, and communications made when patients are researching specific medical conditions. The information that Facebook receives from Defendant includes a full-string, detailed URL, which contains such information as the name of the website, the pages patients are viewing, and search terms that patients have entered. Along with patients' communications, Defendant's website also causes the transmission of personally identifying data to Facebook, including patients' IP addresses, cookie identifiers, browser fingerprints, and device identifiers.

96.     By compelling visitors to their websites to disclose personally identifying data and sensitive medical information to Facebook, Defendant knowingly disclosed information that allows Facebook and other advertisers to link patients' and visitors' Personal Health Information to their private identities and target them with advertising (or do whatever else Facebook may choose to do with this data, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[53] Defendant intentionally shares the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

97.     For example, Plaintiff Jane Doe is an individual with a Facebook account who has also been a patient at Torrence Memorial Hospital. Plaintiff Jane Doe visited Defendant's website at www.torrencememorial.org approximately seven times and entered data, including sensitive medical information, such as details about her medical condition and search for a doctor. The

---

[53] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

information that Plaintiff Jane Doe transmitted included queries about treatment for a concussion that she had suffered.

98.     Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant made the decision to barter its patients' Personal Healthcare Information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiff and Class Members.

**G. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

99.     Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook. That is because, among other things, the Meta Pixel tool is seamlessly and secretly integrated into Defendant's websites and is invisible to patients visiting those websites.

100.    For example, when Plaintiff Jane Doe visited Defendant's website at https://www.torrancememorial.org/, there was no indication that Meta Pixel was embedded on that website or that it would collect and transmit her sensitive medical data to Facebook.

101.    Plaintiff and fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

102.    While Defendant purports to have a "Privacy Notice," that Privacy Notice is effectively hidden from patients, concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors[54]:

---

[54] https://www.torrancememorial.org/





103.    Moreover, Defendant's "Website Privacy Notice" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' and users' Personal Health Information. Indeed, Defendant expressly promised in its "Website Privacy Notice" that "Your privacy is very important to us" and that Defendant "will not sell or otherwise provide the information that we collect to outside third parties for the purpose of direct or indirect mass email marketing."[55] These statements are false and misleading because Defendant in fact discloses patients' Personal Health Information to Facebook so that Facebook can solicit patients with advertising.

104.    Defendant also promised in its "Website Privacy Notice" that it would "follow generally accepted industry standards to protect the information submitted to us, both during transmission and once we receive it."[56] This statement is also false and misleading because hospital systems who comply with generally accepted industry standards for protecting patients' Personal Health Information do not deploy source code on their websites that results in patients' Personal Health Information being disclosed to third-party advertising companies.

---

[55] https://www.torrancememorial.org/website-privacy-notice/

[56] https://www.torrancememorial.org/website-privacy-notice/

105.    Defendant also falsely promises patients in its "Website Privacy Policy" that its policy "will inform you of the information that we, Torrance Memorial, may collect from you, and how it is used." This statement is false and misleading because Defendant nowhere discloses in its "Website Privacy Policy" that patients' Personal Health Information is routinely disclosed to Facebook when patients interact with Defendant's website.

106.    Similarly, while disclosing that its website contains "cookies," Defendant falsely promises that "[u]sage of a cookie is in no way linked to any personally identifiable information on our site."[57] Contrary to that promise, Defendant's website automatically transmits personally identifying information to Facebook via multiple cookies, including the c_user cookie (i.e., the "Facebook cookie") which permits Facebook to link users' website queries to their Facebook profiles.

107.    Even if a visitor stumbled upon Defendant's carefully hidden "Website Privacy Notice," nothing in that notice would be understood by any reasonable prospective or current patient to mean that Defendant is bartering its patients' Personal Health Information in return for access to Facebook's Meta Pixel tool. Indeed, Defendant expressly promises that it will not sell or otherwise provide the information it collects to outside third parties. Accordingly, Patients visiting Defendant's website likely feel assured that their communications about medical conditions such as addiction, cancer, and pregnancy will remain private, not realizing that Defendant has already transmitted this private information to Facebook, so that Facebook can monetize this information by sending targeted content and advertisements to patients.

108.    Defendant's promises are unsurprising. Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. *See, e.g.*, CAL. CIV. CODE §§ 56 *et seq.*; 45 C.F.R. § 164.508. Defendant is not permitted to disclose patients' Protected Health Information to

---

[57] https://www.torrancememorial.org/website-privacy-notice/

an advertising and marketing company like Facebook without express written authorization from patients.

109.   Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiff and Class Members; the secret disclosure by Defendant of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred.*

110.   Likewise, a prospective or current patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised that it would not sell, rent, license, or trade their personally identifiable information for marketing purposes without express authorization.

111.   Neither Plaintiff nor Class Members knowingly consented to Defendant's disclosure of their Personal Health Information to Facebook. Nowhere in Defendant's privacy policy is it disclosed that Defendant routinely transmits patients' Personal Health Information to third party advertising companies like Facebook so that those companies can monetize and exploit patients' health data. Without disclosing such practices, Defendant cannot have secured consent from Plaintiff and Class Members for the disclosure of their Personal Health Information to Facebook and other third-party advertising companies.

112.   Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff's and Class Members' Personal Health Information to Facebook or aid in the same.

**H. The disclosures of personal patient data to Facebook are unnecessary.**

113.   There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical

conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain their healthcare website or provide medical services to patients.

114.    For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign-ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their Personal Health Information with Facebook so that this information can be exploited for advertising purposes.

115.    Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third parties, including Facebook.

**I. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

116.    Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

117.    Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. *See, e.g.*, CAL. CIV. CODE § 56.05 ("medical information"); 45 C.F.R. § 164.514.

118.    Given the application of these laws to Defendant, coupled with Defendant's express promises that they would protect the confidentiality of patients' Personal Health

Information, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

119. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

120. Polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

121. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[58]

122. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[59]

123. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards:*

---

[58] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[59] https://www.wired.co.uk/article/apple-ios14-facebook

*Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

124.   The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[60]

125.   Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's Personal Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

126.   Plaintiff's Personal Health Information that Defendant collected, monitored, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.

127.   It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

128.   In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[61]

---

[60] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

[61] https://ig ft.com/how-much-is-your-personal-data-worth/

CASE NO.                                            − 30 −

129.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "\$0.30" per name.[62] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from \$15 to more than \$40 per user.[63]

130.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[64] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from \$19 to \$164 per year between 2013 and 2020.[65]

131.    Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[66]

132.    Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[67] and has paid teenagers and adults up to \$20 per month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[68]

---

[62] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[63] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[64] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[65] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[66] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also* *https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[67] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounanciations-app

[68] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

CASE NO.                                    − 31 −

133.     A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[69]

134.     Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook without consideration for Plaintiff and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of patients' and users' protected health information.**

135.     In exchange for disclosing Personal Health Information about its patients and users, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

136.     Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

137.     For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

138.     Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

139.     The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

---

[69] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

CASE NO.                                          − 32 −

## K.  Facebook's History of Egregious Privacy Violations

140.    Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

141.    Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

142.    In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

143.    Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

144.    In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[70]

---

[70] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

145.     Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.

146.     In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytica may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

147.     Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[71] Some companies were even able to read users' private messages.

148.     In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[72] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

149.     On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that

[71] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

[72] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

CASE NO.                                    − 34 −

"[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[73]

150.     The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[74] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[75]

151.     More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[76]

152.     These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included

---

[73] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf

[74] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[75] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[76] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[77]

153.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect patients and users from egregious intrusions into patient privacy, choosing instead to benefit at those patients' and users' expense.

154.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendants did nothing to protect patients and users from egregious intrusions into patient privacy, choosing instead to benefit at those patients' and users' expense.

**L. Defendant's failure to inform its patients and prospective patients that their Personal Health Information has been disclosed to Facebook or to take any steps to halt the continued disclosure of patients' Personal Health Information is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.**

155.    Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers. *See e.g.*, CAL. CIV. CODE § 1798.82.

156.    After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[78]

157.    For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[79] Novant Health's data breach announcement conceded that the Meta Pixel tool installed on its websites "allowed certain private information to

---

[77] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[78] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure

[79] https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel

be transmitted to Meta from the Novant Health website."[80] Novant Health further admitted that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[81]

158.    Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their Personal Health Information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[82] Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[83]

159.    Advocate Aurora Health further admitted that a substantial amount of its patients' Personal Health Information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[84] Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[85]

160.    In conjunction with its data breach notice, Advocate Aurora Health claimed that the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our

---

[80] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

[81] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

[82] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[83] https://www.advocateaurorahealth.org/

[84] https://www.advocateaurorahealth.org/pixel-notification/faq

[85] https://www.advocateaurorahealth.org/pixel-notification/faq

vendors."[86] Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of patients' Personal Health Information in the future.[87]

161.    Similarly, in October 2022, WakeMed notified more than 495,000 patients that their Personal Health Information had been transmitted to Facebook through the use of tracking pixels installed on its website.[88] In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on both of its websites resulting in the transmission of patient information.[89] WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or medication information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[90] WakeMed also conceded that it had no idea what Facebook had done with the Personal Health Information that WakeMed had disclosed about its patients.[91] Like the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[92]

---

[86] https://www.advocateaurorahealth.org/pixel-notification/faq

[87] https://www.advocateaurorahealth.org/pixel-notification/faq

[88] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use

[89] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[90] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[91] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[92] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

CASE NO.                           – 38 –

162.    In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[93]

163.    In its data breach notice, Community Health informed patients that "third-party tracking technologies were installed on Community's website."[94] Community Health further admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended." Community Health also conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "seeking treatment at a Community or affiliated provider location."[95]

164.    Community Health—like WakeMed, Novant, and Advocate Aurora Health—also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[96] Community Health, however, also conceded that it had no idea how Facebook or other third parties had exploited the patient Personal Health Information that had been disclosed to them via the pixel technology.

165.    Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites,

---

[93] https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

[94] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

[95] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

[96] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

CASE NO.                                    – 39 –

Defendant has done nothing. Indeed, not only has Defendant hidden these privacy violations from its patients, but Defendant continues to collect, transmit, and disclose its patients' Personal Health Information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient Personal Health Information is patently illegal and in violation of patients' fundamental privacy rights.

166.    As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' Personal Health Information to Facebook. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

167.    Defendant's decision to hide its use of the Meta Pixel tool from its own patients and its refusal to remove such technologies from its websites even after learning that its patients' Personal Health Information was being routinely collected, transmitted, and exploited by Facebook is malicious, oppressive, and in reckless disregard of Plaintiff's and Class Members' rights.

**M. Tolling, Concealment, and Estoppel**

168.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

169.    Defendant seamlessly and secretively incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites, Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

170.   Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

171.   The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

172.   All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' and users' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## VI. CLASS DEFINITION

173.   Defendant's conduct violates the law and breaches express and implied privacy promises.

174.   Defendant's unlawful conduct has injured Plaintiff and Class Members.

175.   Defendant's conduct is ongoing.

176.   Plaintiff brings this action individually and as a class action against Defendant.

177.   Plaintiff brings this action in accordance with the Code of Civil Procedure Rule 382 individually and on behalf of the following proposed Class and subclass:

> **The Torrance Memorial Class:** For the period January 9, 2018, to the present, all California citizens who are, or were, patients or prospective patients of Torrance Memorial or any of its affiliates and who exchanged communications at Defendant's websites, including https://www.torrancememorial.org and any other Torrance Memorial affiliated website.

> **The Patient Subclass:** For the period January 9, 2018, to the present, all California citizens who are, or were, patients of Torrance Memorial or any of its affiliates and who exchanged communications at Defendant's websites, including https://www.torrencememorial.org/ and any other Torrance Memorial affiliated website.

178.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families or staff; (2) any jurors assigned to hear this case and any members of their immediate families; (3) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

179.     Plaintiff and Class Members satisfy the numerosity, commonality, typicality, adequacy, and predominance requirements for suing as representative parties.

180.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals throughout California. The exact number of Class Members can be determined by review of information maintained by Defendant. The proposed class is defined objectively in terms of ascertainable criteria, such that the Court may determine the constituency of the class for the purposes of the conclusiveness of any judgment that may be rendered.

181.     **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

(a) Whether Defendant violated Plaintiff's and Class Members' privacy rights;

(b) Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

(c) Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, CIVIL CODE §§ 56, *et seq.*;

(d) Whether Defendant's acts and practices violated the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq.*;

(e) Whether Defendant's acts and practices violated the California Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502;

(f) Whether Defendant's acts and practices violated California's Online Privacy Protection Act, CAL. BUS. & PROF. CODE §§ 22575, *et seq*;

(g) Whether Defendant's acts and practices violated California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq*;

(h) Whether Defendant's acts and practices violated CAL. CIVIL CODE §§ 1798.81.5, § 1798.81.5;

(i) Whether Defendant's acts and practices violated CAL. CIVIL CODE § 1798.83;

(j) Whether Defendant was unjustly enriched;

(k) Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and,

(l) Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive or other forms of damages and other monetary relief.

182. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class. The claims of Plaintiff and the members of the Class arise from the same conduct by Defendant and are based on the same legal theories.

183. **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigation to remedy privacy violations. Plaintiff has no interest that is in conflict with the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do

so. Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Class.

184. **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

185. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned, and legal developments following, additional investigation, discovery, or otherwise.

## VII. CLAIMS FOR RELIEF

### COUNT I—VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA") CAL. PENAL CODE §§ 630, ET SEQ.

186. Plaintiff re-alleges and incorporates all preceding paragraphs.

187. Plaintiff brings this claim on behalf of herself and all members of the Torrance Memorial Class.

188. The California Legislature enacted the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq.* ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

189.    CAL. PENAL CODE § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

190.    CAL. PENAL CODE § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

191.    All alleged communications between Plaintiff or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

192.    Defendant used a recording device to record the confidential communications without the consent of Plaintiff or Class members and then transmitted such information to others, such as Facebook.

193.    At all relevant times, Defendant's aiding Facebook to learn the contents of communications and Defendant's recording of confidential communications was without authorization and consent.

194.    The Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant told them they would not sell, rent, license, or trade their personally identifiable information to third parties without express consent. Defendant never received that express consent. Nor could Defendant have received consent from Plaintiff and Class Members because Defendant never sought to, nor

did, obtain Plaintiff's and Class Members' consent to transmit their Personal Health Information to Facebook.

195. Defendant engaged in and continues to engage in interception by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

196. The intercepting devices used in this case include, but are not limited to:

    (a) Plaintiff and Class Members' personal computing devices;

    (b) Plaintiff and Class Members' web browsers;

    (c) Plaintiff and Class Members' browser-managed files;

    (d) Facebook's Meta Pixel;

    (e) Internet cookies;

    (f) Defendant's computer servers;

    (g) Third-party source code utilized by Defendant; and

    (h) Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

197. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

198. Defendant aided in the interception of "contents" in at least the following forms:

    (a) The parties to the communications;

    (b) The precise text of patient search queries;

    (c) Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

    (d) The precise text of patient communications about specific doctors;

(e)     The precise text of patient communications about specific medical conditions;

(f)     The precise text of patient communications about specific treatments;

(g)     The precise text of patient communications about scheduling appointments with medical providers;

(h)     The precise text of patient communications about billing and payment;

(i)     The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

(j)     The precise dates and times when patients click to Log-In on Defendant's website(s);

(k)     The precise dates and times when patients visit Defendant's websites;

(l)     Information that is a general summary or informs third parties of the general subject of communications that Defendant send back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

(m)     Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

199.    Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook.

200.    No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Personal Health Information to Facebook. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook. Nor could they have consented, given that Defendant never sought

Plaintiff's or Class Members' consent, or even told visitors to their websites that their every interaction was being recorded and transmitted to Facebook via the Meta Pixel tool.

201.   Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

202.   Plaintiff and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

203.   In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)   Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c)   Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(d)   Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(e)   Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

204.    Plaintiff and Class Members have also suffered irreparable injury from Defendant's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendant and Facebook without their consent and has not been destroyed. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for health information on Torrance Memorial's website. Plaintiff will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use the Torrance Memorial website to search for health information in the future. Due to the continuing threat of injury, Plaintiff and Class Members have no adequate remedy at law, and Plaintiff and Class Members are therefore entitled to injunctive relief.

205.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT II—VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA") CIVIL CODE § 56.06

206.    Plaintiff re-alleges and incorporates all preceding paragraphs.

207.    Plaintiff brings this claim on behalf of herself and all members of the Torrance Memorial Class.

208.    Defendant is a provider of health care under CAL. CIV. CODE. § 56.06, subdivision (a) and (b), because it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing their users to manage their information or for the diagnosis, treatment, or management of a medical condition.

209.    Defendant is therefore subject to the requirements of the CMIA and obligated under subdivision (d) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information disclosed to it.

210.    Defendant violated Civil Code section 56.06 because it did not maintain the confidentiality of users' medical information. Instead, Defendant disclosed Plaintiff's and Class

members' medical information to Facebook without consent. This information was intentionally shared with Facebook, whose business is to sell advertisements based on the data that it collects about individuals, including the data Plaintiff and the Class Members shared with Defendant.

211. Defendant knowingly and willfully, or negligently, disclosed medical information without consent to Facebook for financial gain. Defendant's conduct was knowing and willful as it was aware that Facebook would collect all data inputted while using their website, yet intentionally embedded Meta Pixel anyway.

212. Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

213. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b) Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c) Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(d) Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(e) Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

214.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT III—VIOLATION OF CMIA CIVIL CODE
### § 56.101

215.    Plaintiff re-alleges and incorporates all preceding paragraphs.

216.    Plaintiff brings this claim on behalf of herself and all members of the Torrance Memorial Class.

217.    CIVIL CODE § 56.101, subdivision (a) requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."

218.    Any health care provider who "negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36."

219.    Defendant failed to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information contained therein because it disclosed to Facebook Plaintiff's and Class Members' sensitive medical information without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally identifiable information.

220.    Defendant's failure to maintain, preserve, and store medical information in a manner that preserves the confidentiality of the information was, at the least, negligent and violates CIVIL CODE § 56.36 subdivisions (b) and (c).

221.    Accordingly, Plaintiff and Class Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

222.    In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

    (a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

      (b)    Defendant eroded the essential confidential nature of the doctor-patient relationship;

    (c)    Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    (d)    Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

    (e)    Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

223. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV—VIOLATION OF CMIA CIVIL CODE § 56.10**

224. Plaintiff re-alleges and incorporates all preceding paragraphs.

225. Plaintiff brings this claim on behalf of herself and all members of the Torrance Memorial Class.

226. CIVIL CODE § 56.10, subdivision (a), prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

227. Defendant disclosed medical information without first obtaining authorization when it disclosed Plaintiff's and Class Members' sensitive medical information to Facebook without consent, including information concerning their health status, medical diagnoses,

treatment, and appointment information, as well as personally identifiable information. No statutory exception applies. As a result, Defendant violated CIVIL CODE § 56.10, subdivision (a).

228.    Defendant knowingly and willfully, or negligently, disclosed medical information without consent to Facebook for financial gain.

229.    Accordingly, Plaintiff and Class Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to 56.35; and (5) reasonable attorney's fees and other litigation costs reasonably incurred.

230.    In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)     Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c)     Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(d)     Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(e)     Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

231.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT V—INVASION OF PRIVACY AND VIOLATION OF THE CALIFORNIA CONSTITUTION, ART. 1, § 1

232.   Plaintiff re-alleges and incorporates all preceding paragraphs.

233.   Plaintiff brings this claim on behalf of herself and all members of the Torrance Memorial Class.

234.   Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1.

235.   To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

236.   The right to privacy in California's constitution creates a right of action against private and government entities.

237.   Plaintiff and Class Members had and continue to have a reasonable expectation of privacy in their personal information, identities, and user data pursuant to Article I, Section I of the California Constitution.

238.   Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, including that: (i) the data collected, used, and disclosed by Defendant included personal, sensitive medical information, decisions, and medical diagnoses; and (ii) Plaintiff and Class Members did not consent or otherwise authorize Defendant to disclose this information to others or to collect and use this private information for their own monetary gain.

239.   Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e., "Weight loss"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

240.     The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff's and Class Members' rights to privacy.

241.     Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

242.     Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for health information on Torrance Memorial's website. They will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use the Torrance Memorial website to search for health information in the future.

243.     Plaintiff and Class Members therefore seek injunctive relief to prevent Defendant from continuing to collect, use, and sell Personal Health Information without consent.

244.     Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

245.     Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of their intrusions on Plaintiff and Class Members' privacy.

246.     Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

1      (b)    Defendant eroded the essential confidential nature of the doctor-patient

2             relationship;

3      (c)    Defendant took something of value from Plaintiff and Class Members and

4             derived benefit therefrom without Plaintiff's and Class Members'

5             knowledge or informed consent and without sharing the benefit of such

6             value;

7      (d)    Plaintiff and Class Members did not get the full value of the medical

8             services for which they paid, which included Defendant's duty to maintain

9             confidentiality; and

10     (e)    Defendant's actions diminished the value of Plaintiff and Class Members'

11            personal information.

12     247.   Plaintiff and Class Members are also entitled to punitive damages resulting from

13  the malicious, willful, and intentional nature of Defendant's actions, which caused injury to

14  Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to

15  deter Defendant from engaging in such conduct in the future.

16     248.   Plaintiff and Class Members seek attorney's fees in accordance with CAL. CODE

17  CIV. PROCEDURE § 1021.5.

18     249.   Plaintiff and Class Members also seek such other relief as the Court may deem

19  equitable, legal, and proper.

20  **COUNT VI—VIOLATION OF THE COMPREHENSIVE**
**COMPUTER DATA ACCESS AND FRAUD ACT**

21  **("CDAFA") CAL. PENAL CODE § 502**

22     250.   Plaintiff re-alleges and incorporates all preceding paragraphs.

23     251.   Plaintiff brings this claim on behalf of herself and all members of the Torrance

24  Memorial Class.

25     252.   The California Legislature enacted the Comprehensive Computer Data Access and

26  Fraud Act, CAL. PENAL CODE § 502 ("CDAFA") to "expand the degree of protection . . . from

27

28

tampering, interference, damage, and unauthorized access to [including the extraction of data from] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." CAL. PENAL CODE § 502(a).

253. Plaintiff's and the Class Members' devices on which they accessed the hospital website, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

254. Defendant violated § 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiff's and Class Members' devices in order to wrongfully obtain and use their personal data, including their sensitive medical information, in violation of Plaintiff and Class Members' reasonable expectations of privacy in their devices and data.

255. Defendant violated CAL. PENAL CODE § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiff's and the Class Members' personally identifiable information, including their sensitive medical information.

256. The computers and mobile devices that Plaintiff and Class Members used when accessing the hospital website all have and operate "computer services" within the meaning of CDAFA. Defendant violated §§ 502(c)(3) and (7) of CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with Facebook's wrongful collection of such data.

257. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Defendant violated § 502(c)(8) by knowingly and without permission

1    introducing a computer contaminant via Meta Pixel embedded into the hospital website, which

2    intercepted Plaintiff's and the Class Members' private and sensitive medical information.

3         258.   Defendant's breach caused Plaintiff and Class Members, at minimum, the

4    following damages:

5         (a)    Sensitive and confidential information that Plaintiff and Class Members

6                intended to remain private is no longer private;

7         (b)    Defendant eroded the essential confidential nature of the doctor-patient

8                relationship;

9         (c)    Defendant took something of value from Plaintiff and Class Members and

10               derived benefit therefrom without Plaintiff's and Class Members'

11               knowledge or informed consent and without sharing the benefit of such

12               value;

13        (d)    Plaintiff and Class Members did not get the full value of the medical

14               services for which they paid, which included Defendant's duty to maintain

15               confidentiality; and

16        (e)    Defendant's actions diminished the value of Plaintiff and Class Members'

17               personal information.

18        259.   Plaintiff and Class Members also seek such other relief as the Court may deem

19   equitable, legal, and proper.

20        260.   Plaintiff and the Class Members seek compensatory damages in accordance with

21   CAL. PENAL CODE § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable

22   relief. Plaintiff continues to desire to search for health information on Torrance Memorial's

23   website. They will continue to suffer harm if the website is not redesigned. If the website were

24   redesigned to comply with applicable laws, Plaintiff would use the Torrance Memorial website to

25   search for health information in the future.

26

27

28   CASE NO.                              – 58 –

261. Plaintiff and Class members are entitled to punitive or exemplary damages pursuant to CAL. PENAL CODE § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in CAL. CIVIL CODE § 3294.

262. Plaintiff and the Class members are also entitled to recover their reasonable attorney's fees under § 502(e)(2).

**COUNT VII—BREACH OF IMPLIED-IN-FACT CONTRACT**

263. Plaintiff re-alleges and incorporates all preceding paragraphs.

264. Plaintiff Jane Doe brings this claim on behalf of herself and all members of the Patient Subclass.

265. Defendant promised in its "Website Privacy Notice" that it would "follow generally accepted industry standards to protect the information submitted to us, both during transmission and once we receive it."[97] Defendant also promised that "[o]nly employees who need the information to perform a specific job … are granted access to personally identifiable information."[98] Defendant further promised that "We will not sell or otherwise provide the information we collect to outside third parties."[99]

266. Defendant solicited and invited Plaintiff and Patient Subclass Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiff and Patient Subclass Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiff's and Patient Subclass Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference

---

[97] https://www.torrancememorial.org/website-privacy-notice/
[98] https://www.torrancememorial.org/website-privacy-notice/
[99] https://www.torrancememorial.org/website-privacy-notice/

that Defendant took on obligations outside the plain terms of any express contracts that it may have had with Plaintiff and Patient Subclass Members.

267.    Plaintiff and the Patient Subclass Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiff and Patient Subclass Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiff's and Patient Subclass Members' Personal Health Information.

268.    Defendant required and obtained Plaintiff's and Patient Subclass Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiff's and Patient Subclass Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that it would safeguard Plaintiff's and Patient Subclass Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiff and Patient Subclass Members.

269.    Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiff and Patient Subclass Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiff and Patient Subclass Members. By asking for and obtaining Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiff's and Patient Subclass Members' Personal Health Information was necessary to effectuate the contract between the parties.

270.    Plaintiff and Patient Subclass Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

271.     These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiff and Patient Subclass Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiff and the Patient Subclass Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

272.     In entering into such implied contracts, Plaintiff and Patient Subclass Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

273.     It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiff and Patient Subclass Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiff and Patient Subclass Members' Personal Health Information if they did not intend to provide them with medical treatment and other benefits.

274.     Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiff and Patient Subclass Members from unauthorized disclosure and/or use by third parties.

275.     Plaintiff and Patient Subclass Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiff and Patient Subclass Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would

have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

276.    Plaintiff and Patient Subclass Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiff and Patient Subclass Members by failing to reasonably safeguard and protect Plaintiff's and Patient Subclass Members' Personal Health Information from disclosure to Facebook.

277.    Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiff and Patient Subclass Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiff's and Patient Subclass Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

278.    Instead of safeguarding Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant intentionally shared that information with Facebook, thereby breaching the implied contracts it had with Plaintiff and Patient Subclass Members.

279.    Plaintiff and Patient Subclass Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its website free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiff and Patient Subclass Members would not have sought medical services from Defendant if they had known that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

280.    Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Patient Subclass Members; and (b) protect Plaintiff's and the Patient Subclass Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiff and Patient Subclass Members agreed

to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

281.   Both the provision of medical services and the protection of Plaintiff and Patient Subclass Members' Private Health Information were material aspects of these implied contracts.

282.   The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Patient Subclass Members' Private Health Information unless they consented to third-party disclosures—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

283.   Defendant's express representations, including, but not limited to, the express representations found in its Website Privacy Notice, memorialize and embody an implied contractual obligation requiring Defendant to refrain from aiding or allowing third parties to collect Plaintiff's and Patient Subclass Members' Private Health Information without consent. By soliciting and acquiring Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant assumed an independent duty to handle Plaintiff's and Patient Subclass Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

284.   Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Patient Subclass Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Patient Subclass Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

285.     A meeting of the minds occurred when Plaintiff and the Patient Subclass Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

286.     Plaintiff and the Patient Subclass Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

287.     Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed Facebook to collect and exploit that information without Plaintiff's and Patient Subclass Members' consent.

288.     Defendant also materially breached its contractual obligation to protect Plaintiff's and Patient Subclass Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third-party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third-party advertising companies like Facebook, (4) failed to take other industry-standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (6) failed to install adequate firewalls or

take similar measures to prevent the automatic routing of patients' Personal Health Information to third-party advertising companies like Facebook.

289.   As a result of Defendant's failure to fulfill the data-privacy protections promised in these contracts, Plaintiff and Patient Subclass Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Patient Subclass Members were therefore damaged in an amount at least equal to the difference between the value of the healthcare services with data privacy they paid for and the healthcare services they received.

290.   As a result of Defendant's material breaches, Plaintiff and Patient Subclass Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiff and Patient Subclass Members overpaying Defendant for the services they received.

291.   The services that Plaintiff and Patient Subclass Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

292.   The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that they would allow third parties to secretly collect Plaintiff and Patient Subclass Members' Private Health Information without consent, neither the Plaintiff, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendant and/or their affiliated healthcare providers.

293.    Defendant's conduct in sharing Plaintiff's and Patient Subclass Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiff and Patient Subclass Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiff and Patient Subclass Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

294.    As a direct and proximate result of these failures, Plaintiff and the Patient Subclass Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

295.    Plaintiff and the Patient Subclass Members are entitled to compensatory and consequential damages suffered as a result.

296.    Plaintiff and Patient Subclass Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiff and/or Patient Subclass Members interact with Defendant's websites to make appointments, search for information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions, they risk further disclosure of their Personal Health Information. Plaintiff and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

## COUNT VIII—QUASI-CONTRACT/RESTITUTION/UNJUST ENRICHMENT

297.     Plaintiff re-alleges and incorporates all preceding paragraphs.

298.     Plaintiff Jane Doe brings this claim on behalf of herself and all members of the Patient Subclass.

299.     Plaintiff Jane Doe pleads this cause of action in the alternative to Count VII.

300.     "Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'" *Munoz v. MacMillan* (2011) 195 Cal. App. 4th 648, 661,124 Cal. Rptr. 3d 664; *see also City of Oakland v. Oakland Raiders* (2022) 83 Cal. App. 5th 458, 299 Cal. Rptr. 3d 463, 478.

301.     Plaintiff and Patient Subclass Members personally and directly conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiff's and Class Members' Personal Health Information. Defendant was aware of receiving these payments from Plaintiff and Patient Subclass Members and demanded such payments as a condition of providing treatment.

302.     Plaintiff and Patient Subclass Members also conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Patient Subclass Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Facebook and other third parties. Defendant had knowledge that Plaintiff and Patient Subclass Members had conferred this benefit on Defendant by interacting with their website, and Defendant intentionally installed the Meta Pixel tool on its website to capture and monetize this benefit conferred by Plaintiff and Patient Subclass Members.

303.     Plaintiff and the Patient Subclass Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would

collect, use, and disclose this information to Facebook. The services that Plaintiff and Patient Subclass Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

304. The medical services that Defendant offers are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff's and Patient Subclass Members' Private Health Information without consent, neither Plaintiff, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

305. Defendant unjustly retained those benefits at the expense of Plaintiff and Patient Subclass Members because Defendant's conduct damaged Plaintiff and Patient Subclass Members, all without providing any commensurate compensation to Plaintiff and Patient Subclass Members.

306. The benefits that Defendant derived from Plaintiff and Patient Subclass Members rightly belong to Plaintiff and Patient Subclass Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

307. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT IX—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *ET. SEQ.*

308. Plaintiff re-alleges and incorporates all preceding paragraphs.

309.     Plaintiff Jane Doe brings this claim on behalf of herself and all members of the Patient Subclass.

310.     Defendant's business acts and practices are "unlawful" under the Unfair Competition LAW, CAL. BUS. & PROF. CODE §§ 17200 *et. seq.* (the "UCL") because, as alleged above, Defendant violated California common law, the California Constitution, and other statutes and causes of action alleged herein.

311.     Defendant's business acts and practices are also "unfair" under the UCL. California has a strong public policy of protecting consumers' privacy interests, including consumers' and patients' personal data. Defendant violated this public policy by, among other things, surreptitiously collecting, disclosing and otherwise exploiting Plaintiff and Patient Subclass Members' Personal Health Information by sharing that information with Facebook without Plaintiff's and/or Patient Subclass Members' consent.

312.     Defendant's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to patients. The gravity of the harm of Defendant's secretly collecting, disclosing, and otherwise misusing Plaintiff's and Patient Subclass Members' Personal Health Information by bartering it to Facebook in return for access to the Meta Pixel tool is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiff and Patient Subclass Members were unaware of Defendant's conduct, they could not have avoided the harm.

313.     Defendant's business acts and practices are also "fraudulent" within the meaning of the UCL. Defendant expressly promised Plaintiff and Patient Subclass Members that they were committed to protecting the confidentiality of their Personal Health Information. Defendant also promised that they would never "sell, rent, license, or trade" patients' personally identifying information "to third parties for their own direct marketing use unless we receive your express consent to do so." These promises were false. Defendant regularly shared Plaintiff and Patient Subclass Members' Personal Health Information with Facebook so that Facebook could target

Plaintiff and Patient Subclass Members with advertising benefiting Facebook and its business partners.

314. Defendant's business acts and practices were likely to, and did, deceive members of the public including Plaintiff and Patient Subclass Members into believing their Personal Health Information would be protected from disclosure to Facebook and other third parties.

315. Defendant's violations were and are willful, deceptive, unfair, and unconscionable.

316. Had Plaintiff and Patient Subclass Members known that their sensitive medical information would be intercepted, collected, and transmitted to Facebook by Defendant, they would not have used Defendant's services.

317. Plaintiff and Patient Subclass Members have a property interest in their Personal Health Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant has taken property from Plaintiff and Patient Subclass Members without providing just (or indeed *any*) compensation.

318. Plaintiff and Patient Subclass Members have lost money and property as a result of Defendant's conduct in violation of the UCL. Personal Health Information such as the Personal Health Information collected and transmitted to Facebook by Defendant has objective monetary value. Companies are willing to pay for Personal Health Information, like the information unlawfully collected and transmitted by Defendant to Facebook. For example, Pfizer annually pays approximately $12 million to purchase health data from various sources.[100]

319. Consumers also value their personal health data. According to the annual Financial Trust Index Survey conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey participants would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[101]

---

[100] https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/

[101] https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-

320.    By deceptively collecting, using, and sharing Plaintiff's and Patient Subclass Members Personal Health Information with Facebook, Defendant has taken money or property from Plaintiff and Patient Subclass Members. Accordingly, Plaintiff seeks restitution on behalf of herself and the Patient Subclass.

321.    Plaintiff and Patient Subclass Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiff and/or Patient Subclass Members interact with Defendant's websites to make appointments, search for information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions, they risk further disclosure of their Personal Health Information. Plaintiff also continues to desire to search for health information on Torrance Memorial's website. They will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use the Torrance Memorial website to search for health information in the future. Plaintiff and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

## COUNT IX—VIOLATION OF CAL. CIVIL CODE § 1798.83

322.    Plaintiff re-alleges and incorporates all preceding paragraphs.

323.    Plaintiff Jane Doe brings this claim on behalf of herself and all members of the Patient Subclass.

324.    California CIVIL CODE § 1798.83 requires that "if a business has an established business relationship with a customer and has within the immediately preceding calendar year disclosed personal information" to a third party and "knows or reasonably should know that the third parties used the personal information for the third parties' direct marketing purposes, that business shall" provide in writing to its customers free of charge (1) a list of the categories of

---

100k-or-more-according-to-patients html

personal information provided to third parties and (2) the names and addresses of all third parties who received the customers' personal information during the preceding calendar year. The kinds of "personal information" that the statute expressly protects includes "medical information, "health insurance information," and any other kind of information that "identifies, relates to, describes, or is capable of being associated with … a particular individual." CAL. CIVIL CODE § 1798.80.

325.    Any customer who is injured by a violation of the statute may institute a civil action to recover damages. CAL. CIVIL CODE § 1798.84(b). Additionally, "for a willful, intentional, or reckless violation of Section 1798.83, a customer may recover a civil penalty not to exceed three thousand dollars ($3,000) per violation; otherwise, the customer may recover a civil penalty of up to five hundred dollars ($500) per violation for a violation of Section 1798.83." CAL. CIVIL CODE § 1798.84(c). Further, any business that violates, proposes to violate, or has violated this statute may be enjoined. CAL. CIVIL CODE § 1798.84(e).

326.    Facebook is a third party engaged in direct marketing.

327.    Defendant failed to disclose to Plaintiff and Patient Subclass Members that it was regularly collecting, transmitting, and sharing their Personal Health Information with Facebook so that Facebook could target them with advertising. Defendant willfully, intentionally, and/or recklessly failed to provide the information and disclosures required by CAL. CIVIL CODE § 1798.83 as part of a scheme to barter Plaintiff's and Patient Subclass Members' Personal Health Information to Facebook in return for access to the Meta Pixel tool.

328.    Plaintiff and Patient Subclass Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Patient Subclass Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Facebook and other third parties. Defendant had knowledge that Plaintiff and Patient Subclass Members had conferred this benefit on Defendant by interacting

with their website, and Defendant intentionally installed the Meta Pixel tool on their website to capture and monetize this benefit conferred by Plaintiff and Patient Subclass Members.

329.   Plaintiff and Patient Subclass Members also conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiff's and Patient Subclass Members' Personal Health Information. Defendant was aware of receiving these payments from Plaintiff and Patient Subclass Members and demanded such payments as a condition of providing treatment.

330.   Plaintiff and the Patient Subclass Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to Facebook. The services that Plaintiff and Patient Subclass Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

331.   The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff's and Patient Subclass Members' Private Health Information without consent, neither Plaintiff, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendant and/or their affiliated healthcare providers.

332.   Defendant unjustly retained those benefits at the expense of Plaintiff and Patient Subclass Members because Defendant's conduct damaged Plaintiff and Patient Subclass Members, all without providing any commensurate compensation to Plaintiff and Patient Subclass Members.

333.     Plaintiff and Patient Subclass Members were damaged by Defendant's failure to inform them that their every communication and Personal Health Information was being shared with Facebook, resulting in, at minimum, the following damages:

(a)     Sensitive and confidential information that Plaintiff and Patient Subclass Members intended to remain private is no longer private;

(b)     Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c)     Defendant took something of value from Plaintiff and Patient Subclass Members and derived benefit therefrom without Plaintiff's and Patient Subclass Members' knowledge or informed consent and without sharing the benefit of such value;

(d)     Plaintiff and Patient Subclass Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(e)     Defendant's actions diminished the value of Plaintiff and Patient Subclass Members' personal information.

334.     Plaintiff also continues to desire to search for health information on Torrance Memorial's website. She will continue to suffer harm if Defendant does not make adequate disclosures regarding which third party marketing companies are receiving Plaintiff's and Patient Subclass Members' protected health information. Plaintiff and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendant to comply with CAL. CIV. CODE § 1798.83.

## VIII. DEMAND FOR JURY TRIAL

335.     Plaintiff hereby demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the proposed Class respectfully requests that the Court enter an order:

A.    Certifying the Classes and appointing Plaintiff as the Classes' representative;

B.    Appointing the law firms of Caddell & Chapman, Ahmad, Zavitsanos, & Mensing P.C., and Turke & Strauss, LLP as Class Counsel;

C.    Finding that Defendant's conduct was unlawful, as alleged herein;

D.    Awarding such injunctive and other equitable relief as the Court deems just and proper;

E.    A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

F.    Awarding Plaintiff and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.    Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.    Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.    Granting such other relief as the Court deems just and proper.

Dated: January 9, 2023                    Respectfully submitted,

By: /s/ Michael A. Caddell
Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
MONTEREY CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Foster C. Johnson (SBN 289055)
David Warden*
Joseph Amhad*
Nathan Campbell*
Ahmad, Zavitsanos, & Mensing, P.C.
1221 McKinney Street, Suite 3460
Houston TX 77010
Tel.: (713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ahmad@azalaw.com
ncampbell@azalaw.com

Samuel J. Strauss*
Raina C. Borrelli*
TURKE & STRAUSS LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Tel.: (608) 237-1775
Fax: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

* Motions for Admission to be filed

**COUNSEL FOR PLAINTIFFS,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED**

Electronically FILED by Superior Court of California, County of Los Angeles on 02/17/2023 01:21 PM David W. Slayton, Executive Officer/Clerk of Court, by G. Gasini, Deputy Clerk

Case 2:23-cv-01237-RGK-MAR   Document 1-2   Filed 02/17/23   Page 80 of 122   Page ID #:84

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Michael A. Caddell (SBN 249469)<br>Caddell & Chapman<br>P.O. Box 1311<br>Monterey, CA 93942 | |

TELEPHONE NO.: (713) 751-0400    FAX NO.: (713) 751-0906
ATTORNEY FOR *(Name):* Jane Doe

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill St.
MAILING ADDRESS: 111 North Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

CASE NAME:
Jane Doe v. Torrance Memorial Medical Center

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ **Counter**  ☐ **Joinder**<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 23STCV00395 |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☑ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties        d. ☐ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel     e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve              in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence           f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):*   9
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: January 9, 2023
s/Michael A. Caddell

▶ *Michael A. Caddell*

(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |
|---|---|---|

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.**  If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1.  This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet.  In item 1, you must check **one** box for the case type that best describes the case.  If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below.  A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.**  A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit.  A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading.  A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.**  In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
 Damage/Wrongful Death
Uninsured Motorist (46) *(if the
 case involves an uninsured
 motorist claim subject to
 arbitration, check this item
 instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
 Asbestos Property Damage
 Asbestos Personal Injury/
  Wrongful Death
Product Liability *(not asbestos or
 toxic/environmental)* (24)
Medical Malpractice (45)
 Medical Malpractice–
  Physicians & Surgeons
 Other Professional Health Care
  Malpractice
Other PI/PD/WD (23)
 Premises Liability (e.g., slip
  and fall)
 Intentional Bodily Injury/PD/WD
  (e.g., assault, vandalism)
 Intentional Infliction of
  Emotional Distress
 Negligent Infliction of
  Emotional Distress
 Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
 Practice (07)
Civil Rights (e.g., discrimination,
 false arrest) *(not civil
 harassment)* (08)
Defamation (e.g., slander, libel)
 (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
 Legal Malpractice
 Other Professional Malpractice
  *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
 Breach of Rental/Lease
  Contract *(not unlawful detainer
  or wrongful eviction)*
 Contract/Warranty Breach–Seller
  Plaintiff *(not fraud or negligence)*
 Negligent Breach of Contract/
  Warranty
 Other Breach of Contract/Warranty
Collections (e.g., money owed, open
 book accounts) (09)
 Collection Case–Seller Plaintiff
 Other Promissory Note/Collections
  Case
Insurance Coverage *(not provisionally
 complex)* (18)
 Auto Subrogation
 Other Coverage
Other Contract (37)
 Contractual Fraud
 Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
 Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
 Writ of Possession of Real Property
 Mortgage Foreclosure
 Quiet Title
 Other Real Property *(not eminent
  domain, landlord/tenant, or
  foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
 drugs, check this item; otherwise,
 report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
 Writ–Administrative Mandamus
 Writ–Mandamus on Limited Court
  Case Matter
 Writ–Other Limited Court Case
  Review
Other Judicial Review (39)
 Review of Health Officer Order
 Notice of Appeal–Labor
  Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
 *(arising from provisionally complex
 case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
 Abstract of Judgment (Out of
  County)
 Confession of Judgment *(non-
  domestic relations)*
 Sister State Judgment
 Administrative Agency Award
  *(not unpaid taxes)*
 Petition/Certification of Entry of
  Judgment on Unpaid Taxes
 Other Enforcement of Judgment
  Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
 above)* (42)
 Declaratory Relief Only
 Injunctive Relief Only *(non-
  harassment)*
 Mechanics Lien
 Other Commercial Complaint
  Case *(non-tort/non-complex)*
 Other Civil Complaint
  *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
 Governance (21)
Other Petition *(not specified
 above)* (43)
 Civil Harassment
 Workplace Violence
 Elder/Dependent Adult
  Abuse
 Election Contest
 Petition for Name Change
 Petition for Relief From Late
  Claim
 Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

**Page 2 of 2**

| SHORT TITLE | CASE NUMBER |
|---|---|
| Doe v. Torrance Memorial Medical Center | 23STCV00395 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Courthouse Location (Column C)

| | | | |
|---|---|---|---|
| 1. | Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. | Location where petitioner resides. |
| 2. | Permissive filing in Central District. | 8. | Location wherein defendant/respondent functions wholly. |
| 3. | Location where cause of action arose. | 9. | Location where one or more of the parties reside. |
| 4. | Location where bodily injury, death or damage occurred. | 10. | Location of Labor Commissioner Office. |
| 5. | Location where performance required, or defendant resides. | 11. | Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. | Location of property or permanently garaged vehicle. | | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Doe v. Torrance Memorial Medical Center | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☑ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

| SHORT TITLE | CASE NUMBER |
|---|---|
| Doe v. Torrance Memorial Medical Center | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| | | |
|---|---|---|
| LASC CIV 109 Rev. 01/23<br>For Mandatory Use | CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION | LASC Local Rule 2.3 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Doe v. Torrance Memorial Medical Center | |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 01/23

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| Doe v. Torrance Memorial Medical Center | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☑ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS: |
|---|---|
| CITY: | STATE: | ZIP CODE: |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the __Central__ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: _01/09/2023_____

_Michael A. Coddell_____

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>01/09/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ G. Carini _____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>23STCV00395 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Lawrence P. Riff | 7 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 01/09/2023
    (Date)

David W. Slayton, Executive Officer / Clerk of Court

By G. Carini_____, Deputy Clerk

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application.  These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – EARLY ORGANIZATIONAL MEETING** | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following*:

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the  complaint, and _____ for the  cross-
    (INSERT DATE)                              (INSERT DATE)
    complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case.  The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR PLAINTIFF)

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR DEFENDANT)

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR DEFENDANT)

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR DEFENDANT)

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR _____)

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR _____)

Date:

_____           ➢ _____
(TYPE OR PRINT NAME)                                   (ATTORNEY FOR _____)

Print    Save    Clear

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:　　　　　　　FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION – DISCOVERY RESOLUTION** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally.  Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

      iii.    Be filed within two (2) court days of receipt of the Request; and

      iv.    Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.    No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.    If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.    If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.    If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.    The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.    Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.    Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.    References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

**The following parties stipulate:**

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR PLAINTIFF)

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR DEFENDANT)

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR _____)

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR _____)

Date:
_____
(TYPE OR PRINT NAME)

➢ _____
(ATTORNEY FOR _____)

| Print | Save |   | Clear |
|---|---|---|---|

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:           FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1.  This document relates to:

    ☐   Request for Informal Discovery Conference
    ☐   Answer to Request for Informal Discovery Conference

2.  Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3.  Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4.  **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| Print | Save | | Clear |
|---|---|---|---|

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                          FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine.  Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine.  In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions.  If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues.  For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference.  Each side's portion of the short joint statement of issues may not exceed three pages.  The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____          ➢  _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date:  _____          _____
                                                        JUDICIAL OFFICER

| Print | Save | | Clear |
|---|---|---|---|

# FILED

LOS ANGELES SUPERIOR COURT

MAY 1 1 2011

JOHN A. CLARKE, CLERK

*N. Navarro*

BY NANCY NAVARRO, DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| General Order Re ) <br> Use of Voluntary Efficient Litigation ) <br> Stipulations ) <br> ) <br> ) <br> ─────────────────────────── ) | ORDER PURSUANT TO CCP 1054(a), <br> EXTENDING TIME TO RESPOND BY <br> 30 DAYS WHEN PARTIES AGREE <br> TO EARLY ORGANIZATIONAL <br> MEETING STIPULATION |

Whereas the Los Angeles Superior Court and the Executive Committee of the Litigation Section of the Los Angeles County Bar Association have cooperated in drafting "Voluntary Efficient Litigation Stipulations" and in proposing the stipulations for use in general jurisdiction civil litigation in Los Angeles County;

Whereas the Los Angeles County Bar Association Litigation Section; the Los Angeles County Bar Association Labor and Employment Law Section; the Consumer Attorneys Association of Los Angeles; the Association of Southern California Defense Counsel; the Association of Business Trial Lawyers of Los Angeles; and the California Employment Lawyers Association all "endorse the goal of promoting efficiency in litigation, and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases;"

-1-

ORDER PURSUANT TO CCP 1054(a)

Whereas the Early Organizational Meeting Stipulation is intended to encourage cooperation among the parties at an early stage in litigation in order to achieve litigation efficiencies;

Whereas it is intended that use of the Early Organizational Meeting Stipulation will promote economic case resolution and judicial efficiency;

Whereas, in order to promote a meaningful discussion of pleading issues at the Early Organizational Meeting and potentially to reduce the need for motions to challenge the pleadings, it is necessary to allow additional time to conduct the Early Organizational Meeting before the time to respond to a complaint or cross complaint has expired;

Whereas Code of Civil Procedure section 1054(a) allows a judge of the court in which an action is pending to extend for not more than 30 days the time to respond to a pleading "upon good cause shown";

Now, therefore, this Court hereby finds that there is good cause to extend for 30 days the time to respond to a complaint or to a cross complaint in any action in which the parties have entered into the Early Organizational Meeting Stipulation.  This finding of good cause is based on the anticipated judicial efficiency and benefits of economic case resolution that the Early Organizational Meeting Stipulation is intended to promote.

IT IS HEREBY ORDERED that, in any case in which the parties have entered into an Early Organizational Meeting Stipulation, the time for a defending party to respond to a complaint or cross complaint shall be extended by the 30 days permitted

-2-

ORDER PURSUANT TO CCP 1054(a)

by Code of Civil Procedure section 1054(a) without further need of a specific court order.

DATED: _May 11, 2011_

_Carolyn B. Kuhl_

Carolyn B. Kuhl, Supervising Judge of the
Civil Departments, Los Angeles Superior Court

-3-

ORDER PURSUANT TO CCP 1054(a)

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk

By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE LOS ANGELES SUPERIOR COURT ) — MANDATORY ELECTRONIC FILING ) FOR CIVIL ) ) ) ) | FIRST AMENDED GENERAL ORDER |

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**  The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

1

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) EXEMPT LITIGANTS

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) EXEMPT FILINGS

a) The following documents shall not be filed electronically:

i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

ii) Bonds/Undertaking documents;

iii) Trial and Evidentiary Hearing Exhibits

iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format **when** technologically feasible without impairment of the document's image**.**

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

   i)   Depositions;

   ii)  Declarations;

   iii) Exhibits (including exhibits to declarations);

   iv)  Transcripts (including excerpts within transcripts);

   v)   Points and Authorities;

   vi)  Citations; and

   vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

   Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

   Multiple documents relating to one case can be uploaded in one envelope transaction.

---

4

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

    i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing.  Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.    (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

    ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of:  (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing.  A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled.  If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

   i) Any printed document required pursuant to a Standing or General Order;

   ii) Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

   iii) Pleadings and motions that include points and authorities;

   iv) Demurrers;

   v) Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

   vi) Motions for Summary Judgment/Adjudication; and

   vii) Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents.  Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver.  (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and  California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

2019-GEN-014-00

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019



KEVIN C. BRAZILE
Presiding Judge

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

# Superior Court of California, County of Los Angeles

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:**  ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR

1. **Negotiation**: Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation**: In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all.  Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

    **Mediation may be appropriate when the parties**
    - want to work out a solution but need help from a neutral person.
    - have communication problems or strong emotions that interfere with resolution.

    **Mediation may not be appropriate when the parties**
    - want a public trial and want a judge or jury to decide the outcome.
    - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 Rev. 02/22
For Mandatory Use

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9900
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion**. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration**: Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC)**: MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>01/10/2023<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ A. Morales _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Jane Doe, | |
| DEFENDANT/RESPONDENT:<br>Torrance Memorial Medical Center | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>23STCV00395 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Court Order) of 01/10/2023, Initial Status Conference upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Michael Allen Caddell
Caddell & Chapman
P.O. Box 1311
Monterey, CA 93942

David W. Slayton, Executive Officer / Clerk of Court

Dated: 01/10/2023

By: _A. Morales_____
Deputy Clerk

**CERTIFICATE OF MAILING**

FILED
Superior Court of California
County of Los Angeles

JAN 10 2023

Sherri R. Carter, ................ ....er/Cler'.
by *alfredo Morales*  depu
ALFREDO MORALES

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

JANE DOE

           Plaintiff,

v.

TORRANCE MEMORIAL
MEDICAL CENTER

           Defendant

)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 23STCV00395

INIITIAL STATUS CONFERENCE ORDER (COMPLEX LITIGATION)

Case assigned for all purposes to
Judge Lawrence P. Riff
Spring Street Courthouse
Department 7

ISC Date: March 30, 2023 at 9:00 a.m.

      This case has been assigned for all purposes to Judge Lawrence P. Riff, Complex Litigation, Department 7. PLEASE READ THE COURTROOM INFORMATION FOR DEPARTMENT 7 POSTED ON THE COURT'S WEBSITE (www.lacourt.org.)

      The Court has scheduled an Initial Status Conference on March 30, 2023 at 9:00 a.m. in Department 7, Second Floor, 312 North Spring Street, Los Angeles, California 90012. Department 7 utilizes the LACourtConnect video and telephonic conference

platform for hearings.  To minimize social contact and avoid the risk of COVID-19 infection, the Court encourages parties and counsel to appear remotely (via LACourtConnect).  When appearing via telephone or  video-conference, please call in from a quiet place and bear in mind that the technology only allows one person to be heard at a time.  Please pause frequently so that the Court can interject questions and direct the discussion to the issues that are most important to the Court.

The purpose of the Initial Status Conference is to identify a fair and efficient way of proceeding with the case.  The Court encourages the parties to propose approaches to case management that will promote the fair and efficient handling of the case.  The Court is particularly interested in identifying dispositive or significant issues that may be addressed early in the case.  For example, if an important issue in the case is the admissibility of critical evidence (such as expert testimony), an early motion *in limine* to decide that issue may be the most efficient way to proceed.  Or, if the Court's interpretation of provisions in a contract is a key issue, it may make sense for the plaintiff to amend the complaint (or the defendant to amend the answer) to attach a copy of the contract so that the court can adjudicate the issue in a demurrer.

The Court orders counsel for all parties to confer via telephone, videoconference or other real time technology, at least **20 days** before the Initial Status Conference.  The purpose of the meeting is to discuss the following issues so that counsel can prepare a Joint Statement to be filed with the Court **five court days** before the Initial Status Conference.

All parties in Department 7 must sign up with an e-service provider and activate a message board so that the Court can communicate with counsel prior to the ISC. The Court orders the parties to agree upon and sign up with an e-service provider (Case Anywhere, File & ServeXpress, or Case Homepage) at least 10 court days before the ISC.   So that the Court can promptly issue an order appointing the e-service provider, the Court orders Plaintiff's counsel to identify the selected e-service provider by sending an email to Dept. 7 at SSCDept7@lacourt.org upon agreement of an e-service provider.

Please remember that electronic service is not the same as electronic filing.

To reserve a hearing date, please telephone the courtroom staff when the motion is ready to be filed.

Plaintiff's counsel should take the lead in preparing the Joint Statement and in ensuring that it includes a brief description of the facts and causes of action and addresses the following questions.

1) Are there any issues of judicial recusal or disqualification?

2) Are any parties improperly named as defendants?

3) Will either side challenge jurisdiction or venue or move to compel arbitration?

4) What are the key legal and factual issues affecting each side's evaluation of this case?

5) Are any of these key issues suitable for an early adjudication? For example, does it make sense for the court to promptly adjudicate a statute of limitation defense, interpret a provision in a statute, adjudicate the adequacy of a class representative, or decide the admissibility of critical evidence?

3

6) Is the most efficient procedure for presenting key issues to the court a motion, bifurcated trial, motion in limine, motion to certify or deny class certification, or another proceeding?

7) How and when do the parties plan to engage in the various forms of discovery? [1]

8) Does it make sense to bifurcate certain issues for discovery or trial?

9) How will the parties preserve evidence and uniformly identify documents produced in discovery?

10) Do the parties need to execute a joint stipulation for protective order?  The court recommends the model protective orders found on the Los Angeles Superior Court Website under "Civil Tools for Litigators."

11) Will the parties employ a mediator or ask the Court to order a mandatory settlement conference as a means of alternative dispute resolution (ADR)?

12) Does any party have insurance (indemnity or reimbursement) and are there any potential coverage issues that may affect settlement?

In addition to addressing these questions, the parties' Joint Statement must include the following information.

13) The estimated size of any putative class.[2]

---

[1] If electronically stored information must be produced, the court encourages the parties to have their respective IT consultants/employees participate in the meet and confer process addressing (1) the information management systems employed by the parties; (2) the location and custodians of information (including the identification of network and email servers and hard drives maintained by target custodians); (3) the format in which electronically stored information will be produced; (4) the type of ESI that will be produced, i.e., data files, emails, etc.; (5) appropriate search criteria for focused requests.

[2] In class action/PAGA Initial Status Conferences, the court generally orders the parties to utilize the procedure approved in *Bel-Aire West Landscape, Inc. v. Superior Court* (2007) 149 Cal.App.4th 554, sharing the cost equally.

14) A deadline for adding and serving any new parties.

15) The parties' selected e-service provider (Case Anywhere, FileandServeXpress, or Case Homepage).[3]

16) A description (including case numbers) of any related cases pending in other courts (including class actions with overlapping class definitions).

17) Whether the parties stipulate that discovery and/or pleading stays entered by the Court for case management purposes are excluded from the five year rule under Code of Civil Procedure Section 583.310.

18) A service list identifying all primary and secondary counsel along with their firm names, addresses, telephone numbers, email addresses and fax numbers.

19) Recommended dates and times for the following:

a.  The next status conference.

b.  Mediation completion.

c.  A filing deadline (and proposed briefing schedule) for key motions or proceedings, if any.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Statement, each side may state its position in point/counterpoint fashion.

The Court orders each defendant to file a Notice of Appearance for purposes of identifying and serving all counsel.  The Notice of Appearance shall be without prejudice to any affirmative defense, cross complaint, affirmative defense or jurisdictional challenge.

---

[3] E-service does not effectuate a justiciable filing with the court.  Uploading a document onto the e-service provider's website provides notice to the court and to the parties but does not place them in the public record or effectuate a filing with the court.

**Except for the filing of a Notice of Related Case or a Motion to Compel Arbitration, the Court stays all other proceedings in this action**. The Court issues the stay to assist the Court and the parties in this "complex" case by ensuring, among other things, an orderly schedule for briefing and hearings on procedural and substantive challenges to the complaint. This stay precludes the filing of any answer, demurrer, motion to strike, or motion challenging the jurisdiction of the Court. The stay does not apply to the filing of a notice of related case or any motion to compel arbitration. Before filing a motion to compel arbitration, the Defendant must provide the plaintiff with a copy of the arbitration agreement and meet and confer with counsel to determine whether the plaintiff will oppose the motion to compel arbitration. Although this stay applies to formal discovery, it does not prevent the parties from informally exchanging documents or information that may assist in their initial evaluation of the issues presented in this case. Any future stay ordered by the Court for purposes of case management is not a stay under Code of Civil Procedure section 583.310 unless the Court so orders.

The Court orders Plaintiffs' counsel to serve this Initial Status Conference Order on counsel for Defendant(s), or if counsel is not known, on Defendant(s) within five (5) days of the date of this Order. If the Complaint has not been served as of the date of this Order, Counsel for Plaintiff must serve the Complaint within five (5) days of the date of this Order.

Dated    JAN 1 0 2023

Lawrence P. Riff
Judge of the Superior Court

6

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
### Central District, Spring Street Courthouse, Department 7

**23STCV00395**                                                               January 10, 2023
**JANE DOE,  vs TORRANCE MEMORIAL MEDICAL**                                         9:25 AM
**CENTER**

Judge: Honorable Lawrence P. Riff               CSR: None
Judicial Assistant: Alfredo Morales             ERM: None
Courtroom Assistant: Teresa Bivins              Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order

By this order, the Court determines this case to be Complex according to Rule 3.400 of the California Rules of Court. The Clerk's Office has assigned this case to this department for all purposes.

Pursuant to Government Code Sections 70616(a) and 70616(b), a single complex fee of one thousand dollars ($1,000.00) must be paid on behalf of all plaintiffs. For defendants, a complex fee of one thousand dollars ($1,000.00) must be paid for each defendant, intervenor, respondent or adverse party, not to exceed, for each separate case number, a total of eighteen thousand dollars ($18,000.00), collected from all defendants, intervenors, respondents, or adverse parties. All such fees are ordered to be paid to Los Angeles Superior Court, within ten (10) days of service of this order.

By this order, the Court stays the case, except for service of the Summons and Complaint. The stay continues at least until the Initial Status Conference. Initial Status Conference is set for 03/30/2023 at 09:00 AM in this department. At least twenty (20) days prior to the Initial Status Conference, counsel for all parties must discuss the issues set forth in the Initial Status Conference Order issued this date. Counsel must file a Joint Initial Status Conference Response Statement five (5) court days before the Initial Status Conference.

The Initial Status Conference Order, served concurrently with this Minute Order, is to help the Court and the parties manage this complex case by developing an orderly schedule for briefing, discovery, and court hearings. The parties are informally encouraged to exchange documents and information as may be useful for case evaluation.

Responsive pleadings shall not be filed until further Order of the Court. Parties must file a Notice of Appearance in lieu of an Answer or other responsive pleading. The filing of a Notice of

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 7

**23STCV00395**                                                    January 10, 2023
**JANE DOE,  vs TORRANCE MEMORIAL MEDICAL**                                   9:25 AM
**CENTER**

Judge: Honorable Lawrence P. Riff            CSR: None
Judicial Assistant: Alfredo Morales          ERM: None
Courtroom Assistant: Teresa Bivins           Deputy Sheriff: None

Appearance shall not constitute a waiver of any substantive or procedural challenge to the Complaint. Nothing in this order stays the time for filing an Affidavit of Prejudice pursuant to Code of Civil Procedure Section 170.6. Nothing in this order stays the filing of an Amended Complaint pursuant to Labor Code Section 2699.3(a)(2)(C) by a plaintiff wishing to add a Private Attorney General Act ("PAGA") claim.

For information on electronic filing in the Complex Courts, please refer to https://www.lacourt.org/division/efiling/efiling2.aspx#civil. See, in particular, the link therein for "Complex Civil efiling." Parties shall file all documents in conformity with the Presiding Judge's First Amended General Order of May 3, 2019, particularly including the provisions therein requiring Bookmarking with links to primary documents and citations; that Order is available on the Court's website at the link shown above.

For efficiency in communication with counsel, the complex program requires the parties in every new case to use an approved third-party cloud service that provides an electronic message board. In order to facilitate communication with counsel prior to the Initial Status Conference, the parties must sign-up with the e-service provider at least ten (10) court days in advance of the Initial Status Conference and advise the Court which provider was selected.

The court has implemented LACourtConnect to allow attorneys, self-represented litigants and parties to make audio or video appearances in Los Angeles County courtrooms. LACourtConnect technology provides a secure, safe and convenient way to attend hearings remotely. A key element of the Court's Access LACourt YOUR WAY program to provide services and access to justice, LACourtConnect is intended to enhance social distancing and change the traditional in-person courtroom appearance model. See https://my.lacourt.org/laccwelcome for more information.

This Complex Courtroom does not use Los Angeles Superior Court's Court Reservation ("CRS") portal to reserve motion hearing dates. Rather, counsel may secure dates by calling the Courtroom Assistant at 213-310-70xx with the "xx" being the Department number, e.g. Dept. 1 is 01 and Dept. 10 is 10.

Court reporters are not provided for hearings or trials. The parties should make their own arrangements for any hearing where a transcript is desired.

If you believe a party or witness will need an interpreter, see the court's website for information on how to make such a request in a timely manner. https://www.lacourt.org/irud/UI/index.aspx

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 7

**23STCV00395**                                                    January 10, 2023
**JANE DOE,  vs TORRANCE MEMORIAL MEDICAL**                                9:25 AM
**CENTER**

Judge: Honorable Lawrence P. Riff          CSR: None
Judicial Assistant: Alfredo Morales        ERM: None
Courtroom Assistant: Teresa Bivins         Deputy Sheriff: None

Counsel are directed to access the following link for further information on procedures in the Complex litigation Program courtrooms: https://www.lacourt.org/division/civil/CI0042.aspx.

The plaintiff must serve a copy of this minute order and the attached Initial Status Conference Order on all parties forthwith and file a Proof of Service in this department within seven (7) days of service.

Certificate of Mailing is attached.

Electronically FILED by Superior Court of California, County of Los Angeles on 02/02/2023 02:18 PM David W. Slayton, Executive Officer/Clerk of Court, by K. Valenzuela,Deputy Clerk

Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
Monterrey, CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906

*Attorneys for Plaintiff*

*[additional counsel listed on signature page]*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

|  |  |
|---|---|
| JANE DOE, individually and on behalf of others similarly situated,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>TORRANCE MEMORIAL MEDICAL CENTER<br><br>*Defendants.* | CASE NO:  23STCV00395<br><br>**PROOF OF PERSONAL SERVICE** |

Pursuant to Code of Civil Procedure, section 1011, Plaintiff files the attached proof of personal service on defendant Torrance Memorial Medical Center.

Dated: February 2, 2023

Respectfully submitted,

By: */s/ Michael A. Caddell*
Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
CADDELL & CHAPMAN
P.O. Box 1311
Monterrey, CA 93942

CASE NO.                                          – 1 –

Tel.: (713) 751-0400
Fax: (713) 751-0906

Foster C. Johnson (SBN 289055)
David Warden (*pro hac vice* forthcoming)
Joseph Amhad (*pro hac vice* forthcoming)
Nathan Campbell (*pro hac vice* forthcoming)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston TX 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ahmad@azalaw.com
ncampbell@azalaw.com

**COUNSEL FOR PLAINTIFF JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

PROOF OF PERSONAL SERVICE

**LOS ANGELES COUNTY SUPERIOR COURT
CENTRAL DISTRICT**

| | |
|---|---|
| JANE DOE | Case No.:23STCV00395 |
| Plaintiff | |
| v. | |
| TORRANCE MEMORIAL MEDICAL CENTER | |
| Defendant | |

PROOF OF SERVICE

That I, Derek Z. Lee hereby solemnly affirm under penalties of perjury and upon personal knowledge that the contents of the foregoing documents are true and do affirm I am a competent person over 18 years of age and not a party to this action

That on 1/20/2023 at 1:20 PM at 3330 Lomita Blvd., Torrance, CA 90505 I served TORRANCE MEMORIAL MEDICAL CENTER with the following list of documents: SUMMONS; CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL; CIVIL CASE COVER SHEET; ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE; FIRST AMENDED GENERAL ORDER; NOTICE OF CASE ASSIGNMENT UNLIMITED CIVIL CASE; VOLUNTARY EFFICIENT LITIGATION STIPULATIONS; INITIAL STATUS CONFERENCE ORDER (COMPLEX LITIGATION); MINUTE ORDER; NOTICE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE by then and there personally delivering a true and correct copy of the documents into the hands of and leaving with upon Laura Tweedt-Roybal whose relationship is Legal Administrative Assistant in Los Angeles County

That the description of the person actually served is as follows: Gender: Male Skin: White Age: 50s Height: 5'4" Weight: 160 Hair: Brown  Eyes: Brown Marks:

That the fee for this Service is  $ .00



_____
Derek Z. Lee
Contracted by CLSS Online, Inc.
1250 Glenoaks Boulevard, Suite 188
Glendale, CA 91201
(800) 336-2577

FEB 0 1 2023
Executed On:

Order #:8275
Their File T30.231